**CARL SIMON, Petitioner**

**v.**

**GOVERNMENT OF THE VIRGIN ISLANDS, ATTORNEY
GENERAL—IVER STRIDIRON, BUREAU OF CORRECTIONS:
WARDEN IVAN OLIVER, Defendants**

Misc. No. 28/2000

Territorial Court of the Virgin Islands

Division of St. Thomas and St. John

July 18, 2002

3

4

CARL SIMON, Wallens Ridge State Prison, Big Stone Gap, VA, *Pro se Petitioner*.

CAROL THOMAS JACOBS, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, VI., and RICHARD SCHRAEDER, ESQ., Assistant Attorney General, Virgin Islands Department of Justice, Christiansted, St. Croix, VI, *Attorneys for Respondents*.

HODGE, *Judge*

## MEMORANDUM OPINION

(July 18, 2002)

Before the Court is Petitioner's "Amended Petition for Emergency Writ of Habeas Corpus," pursuant to V.I. CODE ANN. tit. 5, sections 1301-1325. Because (1) any prejudice that inured to Petitioner as a result of the improper amendment of the charging document was harmless; (2) Petitioner, who was not a party to the trial of his codefendant, could not collaterally estop his codefendant from presenting inconsistent testimony at Petitioner's trial; (3) the trial court's jury instructions concerning aiding and abetting comported with relevant precedent; (4) the government's alleged withholding of an alleged agreement for leniency with Petitioner's codefendant was not prejudicial; (5) the

government did not improperly vouch for the credibility of Petitioner's codefendant; and (6) a victim's unwilling abandonment of his property due to Petitioner's use of force or threat of bodily harm was consistent with the Virgin Islands' robbery statute's requirement that the property be taken from the victim's person or immediate presence, Petitioner's habeas corpus petition shall be dismissed.

## FACTS

Carl Simon ("Simon") was convicted in the Territorial Court of the Virgin Islands and sentenced to life imprisonment for first-degree felony murder, in violation of 14 V.I.C. §§ 11(a), 921, and 922(a); first-degree robbery, in violation of 14 V.I.C. §§ 11(a) and 1862(2); and third-degree burglary, in violation of 14 V.I.C. § 444(1). (Pet'r's Pet'n for Emergency Writ Habeas of Corpus at 3.) Simon's convictions stemmed from the death of Daniel Ezekiel ("Ezekiel") and the robbery of Elroy Connor ("Connor") when, on September 7, 1993, Simon, James Roach ("Roach"), and a third accomplice broke into Connor's home on St. John, U.S. Virgin Islands.

### 1. The Reduction of Roach's Sentence

On May 5, 1994, Roach was tried and convicted in the United States District Court of the Virgin Islands for first-degree murder and sentenced to life imprisonment. Roach subsequently testified as a government witness at Simon's trial. (Pet'r's Am. Pet'n for Emergency Writ of Habeas Corpus at 2). On June 12, 1996, more than one year after Simon's conviction, the United States filed a motion on behalf of Roach for a reduction in sentence, pursuant to Rule 35(b) of the Federal Rules of Criminal Procedure. (Req. of the United States for Reduction of Sentence for Changed Circumstances (attached as ex. K to Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus).) The United States claimed that Roach had "substantially assisted the United States by providing valuable testimony in the trial of Carl Simon, conducted in Territorial Court." (*Id.*) Roach ultimately was resentenced to twenty years' imprisonment. (J. & Commitment of June 21, 1996 (attached as ex. I to Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus).)

6

## 2. Amendment of the Information

On May 19, 1994, Simon was arrested and charged by information with premeditated murder, in violation of 14 V.I.C. § 922(a)(1), and third-degree burglary. (Information of May 24, 1994.) During a pretrial conference on January 10, 1995, the government indicated that it intended to amend the Information to include robbery. (Tr. of Jan. 10, 1995, at 19.) Simon's attorney, who was present, did not object. (*Id.*) On January 13, the government provided defense counsel with a copy of the Amended Information, (tr. of Jan. 13, 1995, at 24), which changed the count of premeditated murder to felony murder, added a count of robbery, added a count of conspiracy, and left the burglary count unchanged, (Am. Information of Jan. 13, 1995). The government stated that the robbery count would serve as the underlying predicate for the new felony murder count, and defense counsel noted its objection. (Tr. of Jan. 13, 1995, at 27.)

On January 18, the government officially filed its motion to amend the Information, claiming that, "although additional or different offenses have been charged, [no] substantial rights of the defendant have been prejudiced." (Gov't's Mem. of Law in Supp. of the Gov't's Mot. to Amend the Information.) On the same day, defense counsel filed a motion opposing the proposed amendment, arguing that he did not "have adequate time to prepare to defend these additional charges." (Def.'s Mot. in Opp'n to Gov't's Mot. to Amend the Information.) The trial court did not act on the government's motion.

Jury selection began on January 23. On that date, the government noted a defect in the Information and orally moved to file a Second Amended Information to exclude the conspiracy count. (Tr. of Jan. 23, 1995, at 9-10.) Defense counsel responded as follows:

> I have had a brief moment to look at the Amended Information and the Government keeps amending up to today. I don't know what to do, to defend against. I am in an awkward situation because I have a hostile client . ... It has been brought to my attention [that] Mr. Simon is plotting some kind of strategy against me, in that he is going to, at some point or the other, claim ineffective assistance of counsel. Therefore, I cannot be fighting the claim and fighting the case of the Government all together [at] once. That's my objection,

7

my objection to the several motions and so forth, particularly at the last minute to submit an Amended Information.

I don't have the time to be able to investigate and corroborate certain of the facts [sic] or some of the elements necessary to prove those charges, and I will definitely be in an awkward position to defend.

(*Id.* at 12.) After some confusion,[1] the trial court ultimately found that, "while [the Amended Information] adds a new count, I do not see how it prejudices the Defendant." Subsequently, in a colloquy with Simon concerning self-representation, the trial court reiterated that, although the government wished to add a new count of robbery, the court would grant the government's motion to amend the Information. (*Id.* at 24-27.)[2] The government eventually submitted the Second Amended Information on January 25. (Second Am. Information.)

### 3. Jury Trial Proceedings

At trial, the government offered the testimony of Roach, who stated that he, Simon, and a third man met on St. John with the intent to commit a burglary. (Tr. vol. I at 58-62.) Roach testified that he, Simon, and the third man entered a house belonging to Elroy "Nature" Connor by pushing through a screen window and unlocking the front door from the inside. (*Id.* at 64-65.) Roach testified that they were in the house for

---

[1] Both the trial court and defense counsel seemed uncertain about which counts appeared in the original Information and which appeared in the Amended Information. Although the original Information did not mention either felony murder or robbery, the trial court found that the addition of the robbery count would not surprise the defense "because [the felony murder count] states that this killing was allegedly perpetrated during the act of a robbery." (Tr. of Jan. 23, 1995, at 16.) Defense counsel responded, mistakenly, that the government had "added Burglary, which is a totally separate offense." (*Id.*) Although not actively contributing to the confusion, the government's response that "Burglary was there, [in] the original," did little to clarify the misperceptions of the trial court and defense counsel. (*Id.*)

Additionally, it remains unclear whether the court was ruling on the motion to amend the Information or the government's oral motion to file a Second Amended Information. Thus, this Court assumes that, during these proceedings, the trial court simultaneously granted both the motion to amend the Information and the government's oral motion to file a Second Amended Information.

[2] Again, this Court can only assume that the trial court granted both the motion to amend the Information and the government's oral motion to file a Second Amended Information.

8

approximately fifteen minutes before Connor returned home with Ezekial. (*Id.* at 67-68.) Roach testified that, while hiding in a back bedroom, Simon announced that he was going to "stick up" Connor and Ezekial. (*Id.* at 68-70.) Roach testified that, after Simon left the room, he heard a gunshot and emerged from the bedroom to see Ezekial lying on the floor and Simon wrestling with Connor, who was also armed. (*Id.* at 72.) Roach testified that, after a brief struggle that took him, Simon, and Connor outside the house, Connor fled and Simon returned to the house, where he and the third man emerged with a bag in his hand. (*Id.* at 74-75). Roach claimed that, during the robbery, Simon wore a t-shirt around his head as a mask. (*Id.* at 75.) On cross-examination, Roach confessed that he had lied at his own trial about whether he knew Simon, (*id.* at 93), lied to an alibi witness concerning his whereabouts on the night of Ezekial's murder, (*id.* at 118, 123), and admitted that he was receiving "protection" from the government in exchange for his testimony, (*id.* at 124, 140).

Connor testified that, when he and Ezekial arrived at his house, he was carrying two bags containing money and lottery tickets, which he set on his porch. (*Id.* at 183-86.) Connor stated that he heard voices and entered his house to find Roach pointing a gun at Ezekial, (*id.* at 189-90), and a smaller man wearing a mask who was giving orders, (*id.* at 191-92, 197-98, 221, 232-33). Connor related that he then retrieved a hidden pistol, and a struggle ensued between him and Roach over control of the guns. (*Id.* at 192-94.) After being struck on the head, Connor recovered one of the bags of money, and fled the scene. (*Id.* at 195.) Connor testified that when he returned to the house with the police, they found Ezekial dead from a gunshot wound to the head and the remaining bag of money missing. (*Id.* at 199-200, 209.) Connor admitted that he had lied about owning a gun at Roach's trial. (*Id.* at 209-211, 221-22.) Connor also testified that Ezekial had not yet been shot when Connor fled the scene. (*Id.* at 193.)

The jury heard testimony from Joseph Allen that, on the night of the robbery and murder, Allen encountered both Simon and Roach near Cruz Bay, St. John. (Tr. vol. II at 6). Allen testified that (1) Simon, while using a pay phone, asked Allen to stand in front of him, and (2) Simon rode with him to another part of St. John where Simon briefly disembarked and returned wearing a different shirt. (*Id.* at 6-9.) Allen further testified that, after he and Simon returned to St. Thomas by ferry,

9

Simon tried to hide behind him in order to avoid a police sweep of the ferry dock. (*Id.* at 10-13.) On cross-examination, Allen admitted that he initially gave a false statement to the police. (*Id.* at 18-20.) Another witness, Officer Duane Donovan, testified that, after collecting evidence from Connor at a medical clinic, he recalled seeing Simon by the St. John ferry dock. (*Id.* at 50-53.)

During its closing argument, the government made the following statement:

> The Criminal action of Carl Simon resulted in the death of Daniel Ezekial, and on behalf of the Government of the Virgin Islands, we are asking you to hold Carl Simon accountable, because James Roach is a credible witness. True, he did testify in the prior court proceeding. He did give false testimony before, but he has told each and everyone [sic] of you the reasons why, because he was fearful. He was fearful as to what Carl Simon would do to him. He had seen Carl Simon kill before. He knew what Carl Simon could do.

(*Id.* at 102.) In its rebuttal closing argument, the government also noted that Simon is shorter than Roach. (*Id.* at 129.)

The trial court instructed the jury at that it had the sole authority to judge the credibility of the witnesses and weigh the trustworthiness of their testimony. (*Id.* at 138-41.) The trial court also charged the jury that it could take into account Roach's prior felony conviction when passing on his credibility. (*Id.* at 144-45.) On the charge of aiding and abetting, the trial court instructed the jury as follows:

> Now, in order to aid and abet another to commit a crime, it is necessary that the accuse, as in this case, Mr. Simon, willfully associate himself in some way with a criminal venture, and willfully participated in it as he would in something he wishes to bring about, that is to say, that he willfully seek by some act or omission of his, to make the criminal venture a success.
>
> * * *
>
> Now, mere presence at the scene of a crime, and knowledge that a crime is being committed, is not sufficient to establish that the Defendant aided and abetted in the crime, unless you find, beyond a reasonable doubt, that the Defendant was a participant and not merely a knowing spectator.

10

(*Id.* at 151-52.) The jury ultimately found Simon guilty on all three counts, (*id.* at 199-200), and the trial court sentenced him to (1) life imprisonment without the possibility of parole on the felony-murder count, (2) seven years', six months' imprisonment on the robbery count, and (3) three years', six months' imprisonment on the burglary count, (J. & Commitment of Feb. 27, 1995).

## 4. Direct Appeal

Simon subsequently filed an appeal with the Appellate Division of the District Court of the Virgin Islands, in which he claimed that the trial court erred in allowing the government to amend the Information by substituting felony murder for premeditated murder and adding the underlying felony count of robbery. (*Simon v. Gov't of the V.I.*, D.C. Crim. App. No. 1995-67, slip op. at 4 (D.V.I. App. Div. Aug. 20, 1997) (*per curiam*) (attached as ex.1 to Resp't's Opp'n Resp. to Pet'r's Am. Writ of Habeas Corpus).) The appellate court recognized that the Federal Rules of Criminal Procedure permit the amendment of an information "if no additional or different offense is charged and if no substantial rights of the defendant are prejudiced." (*Id.*) (quotation marks omitted.) The appellate court, however, ruled that, because "felony murder is simply one means of proving a first degree murder" and thus "not a different or additional offense from first degree murder, no substantial right of the defendant was prejudiced." (*Id.*) With respect to Simon's claims that he was prejudiced by the amendment because defense counsel had insufficient time to prepare, the appellate court noted that counsel never asked for a continuance to prepare an alternate defense. (*Id.* at 5.) The appellate court further remarked that "it is difficult to conceive how the defense would have conducted itself differently during the trial had the information originally charged felony murder." (*Id.* at 6.) In denying Simon's appeal, the appellate court did not address the issue of whether the addition of robbery to the amended information amounted to an "additional or different offense."

## 5. Habeas Corpus Proceedings

Simon then filed an initial petition for a writ of habeas corpus in the Territorial Court, pursuant to 5 V.I.C. § 1301-1362. (Pet'n for Emergency Writ of Habeas Corpus at 1.) Simon subsequently requested that this Court appoint counsel to assist him in the prosecution of his

11

petition. (Pet'r's Mot. for Appointment of Counsel.) Appointed counsel ultimately submitted an amended petition on behalf of Simon. (Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus.) After Respondents filed their response to Simon's amended petition, Simon filed a "Motion for Change of Counsel," asking that his court-appointed post-conviction attorney be discharged and another attorney appointed to represent him. (*See generally* Mot. for Change of Counsel.) Simon also filed his *pro se* reply to Respondents' brief. (*See generally* Pet'r's Resp. to Def.'s [sic] Resp.) (hereinafter "Pet'r's Reply"). This Court granted Simon's request to discharge counsel, but, noting that there is no constitutional right to counsel on collateral appeal, declined to appoint new counsel. (Order of Jan. 25, 2002.)

## DISCUSSION

### 1. Amendment of the Information

Simon argues that, after nine months of representing that it would proceed on a theory of first-degree murder and burglary, the government's improper amendment of the Information on the day of trial prejudiced his ability to prepare adequately for trial. (Pet'r's Mem. in Supp. of Am. Writ of Habeas Corpus at 1-4.) Simon contends that he should have been granted an additional thirty days to prepare his defense against the robbery charge, without which he was deprived of his sixth amendment right to be apprised of the charges against him and to receive effective assistance of counsel. (*Id.* at 4-7.) In a footnote, Simon also suggests that, because the crime of robbery requires an additional element that theft or larceny does not require, amending the Information to replace robbery as the predicate offense for felony murder improperly inserts a new offense into the Information. (*Id.* at 5 n.3.)

The respondents answer that applicable Virgin Islands law does not require a thirty-day preparation period upon the amendment of an information. (Resp't's Opp'n Resp. to Pet'r's Am. Writ of Habeas Corpus at 2.) Respondents note that, because other courts have concluded that felony murder is the same as first-degree murder, the amendment of the Information to charge felony murder did not charge a new offense or prejudice his substantial rights. (*Id.* at 2.) Respondents rely on the district court's review of Simon's direct appeal to suggest that, even if the Court

had granted defense counsel additional time to prepare, there is little that counsel could have done to bolster Simon's case. (*Id.* at 3 & n.6.)

In his *pro se* reply, Simon attempts to clarify his position that, because the government amended the Information to include robbery as the predicate offense for felony murder, the inclusion of robbery constituted an impermissible addition of a new offense. (Pet'r's Reply at 4.) Simon argues that the government and the appellate court rely on cases where the defendant was charged originally with a felony that later became the basis for a felony-murder charge. (*Id.* at 5.) Simon claims that, because he was not arraigned on the robbery count, its inclusion in the Amended Information as a basis for the felony murder charge violated Rule 7(e) of the Federal Rules of Criminal Procedure. (*Id.* at 5-7.) Simon further contends that impermissibly amending an information can never constitute harmless error. (*Id.* at 7-10.)

█ The Virgin Islands Code provides that "every person unlawfully imprisoned or restrained of his liberty, under any pretense whatever, may prosecute a writ of habeas corpus, to inquire into the cause of such imprisonment or restraint." 5 V.I.C. § 1301. Following the doctrine that trial courts should have first opportunity to review their judgments and correct any constitutional errors, a petition for post-conviction relief is first reviewed by the court in which the petitioner was convicted. *Joseph v. de Castro*, 26 V.I. 14, 17 (Terr. Ct. St. C. 1990), *superceded by statute on other grounds, Parrott v. Gov't*, 43 V.I. 277, 285-86, 230 F.3d 615, 622 (3d Cir. 2000). The Territorial Court of the Virgin Islands has jurisdiction over habeas petitions arising from convictions of territorial law. *Parrott*, 43 V.I. at 284, 230 F.3d at 621.[3]

The Rules of Criminal Procedure, made applicable to this Court through Rule 7 of the Rules Governing the Territorial Court of the Virgin Islands, provide that an information must contain "the essential facts constituting the offense charged." FED. R. CRIM. P. 7(c)(1). An information may be amended "at any time before verdict or finding *if no additional or different offense is charged* and if substantial rights of the defendant are not prejudiced." FED. R. CRIM. P. 7(e) (emphasis added).

The Virgin Islands Code defines first-degree murder as follows:

---

[3] Interpreting the 1984 Amendments to the Revised Organic Act of 1954, §§ 21-25, 48 U.S.C. §§ 1611-1615, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 149-64 (1995) (preceding V.I. CODE ANN. tit. 1 ("Revised Organic Act of 1954")).

All murder which—

(1) is perpetrated by means of poison, lying in wait, torture or by any other kind of willful, deliberate and premeditated killing; or

(2) is committed in the perpetration or attempt to perpetrate arson, burglary, kidnapping, rape, robbery or mayhem—

is murder in the first degree.

14 V.I.C. § 922(a) (1996). The Code also states that "whoever (1) with intent to commit an offense therein, breaks and enters a dwelling house ... or (2) being in any dwelling house ... commits an offense therein and breaks out of the same" is guilty of third-degree burglary. 14 V.I.C. § 444. The Code further defines robbery as "the unlawful taking of personal property in the possession of another, from his person or immediate presence and against his will, by means of force or fear." 14 V.I.C. § 1861. The definition of third-degree robbery contemplates "circumstances not amounting to robbery in the first degree or robbery in the second degree."[4] 14 V.I.C. § 1864.

### a. Whether Challenges to the Sufficiency of the Information Are Cognizable on Habeas Corpus Review

The issue of whether challenges to the sufficiency of a charging document are cognizable on habeas corpus review is a question not previously considered in this Court. A handful of jurisdictions do not

---

[4] First-degree robbery is defined as follows:

A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another perpetrator of the crime:

(1) Causes physical injury which is incapacitating in any way to any person who is not a perpetrator of the crime; or

(2) Displays, uses or threatens the use of a dangerous weapon.

14 V.I.C. § 1862. Second-degree robbery is defined as follows:

A person is guilty of robbery in the second degree when he forcibly steals property and when:

(1) He is aided by another person actually present; or

(2) In the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime causes physical injury to any person who is not a participant in the crime.

14 V.I.C. § 1863.

permit first-time post-conviction challenges to charging instruments.[5] This approach stems from the nature of the charging document itself. A charging document binds a defendant only during the pendency of the trial, after which the charging instrument becomes void and the judgment or conviction serves to bind the defendant. *See, e.g., State ex rel. Morris v. Leonard*, 86 Ohio St. 3d 624, 716 N.E.2d 208, 209 (1999). Thus, a charging document cannot be attacked collaterally because, by the time a court enters a judgment, the charging document has ceased to exist.

The jurisdictions that subscribe to this approach find additional support in Supreme Court precedent, whereby federal habeas courts are precluded from addressing new collateral challenges to the sufficiency of an indictment. *Goto v. Lane*, 265 U.S. 393, 402, 44 S. Ct. 525, 527, 68 L. Ed. 1070 (1924). In a related vein, the Supreme Court has limited collateral attacks on Fourth Amendment search-and-seizure claims, holding that "a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim," absent a showing that petitioner was denied the opportunity for full and fair hearing of the claim at trial and on direct review. *Stone v. Powell*, 428 U.S. 465, 491-92 n.31, 96 S. Ct. 3037, 3051, 49 L. Ed. 2d 1067 (1976). The Supreme Court concluded that claims brought under the exclusionary rule have no bearing on a petitioner's guilt, and that the costs of applying the exclusionary rule, even at trial, outweigh its benefits. 428 U.S. at 489-92 & n.31, 96 S. Ct. at 3050-51. This reasoning also could be applied to the sufficiency of charging documents, allowing courts to posit that collateral attacks on an information or indictment have nothing to do with the legitimacy of a prisoner's incarceration.

For a variety of reasons, this Court does not find either line of reasoning persuasive. In the first place, restrictions to collateral challenges to the charging instrument generally extend to claims that were not raised either at trial or on direct appeal. *See, e.g., State ex rel. Bragg v. Seidner*, 92 Ohio St. 3d 87, 748 N.E.2d 532, 533 (2001). This approach is mirrored in habeas corpus proceedings that arise under

---

[5] *See, e.g., Buoscio v. Bagley*, 91 Ohio St. 3d 134, 742 N.E.2d 652, 653 (2001); *McConaughy v. Lockhart*, 310 Ark. 686, 840 S.W.2d 166, 167 (1992); *Ex parte Gibson*, 800 S.W.2d 548, 552 (Tex. Crim. App. 1990) (disallowing challenges based on the form or substance of an indictment). *But see, e.g., Dennis v. State*, 647 S.W.2d 275, 278-79 (Tex. Cr. App. 1983) (permitting challenges to charging documents that are void *ab initio*).

15

federal law. *See Goto*, 265 U.S. at 402, 44 S. Ct. at 527. In this case, Simon raised his claim on direct appeal, thus preserving for review in collateral proceedings. (*See Simon*, D.C. Crim. App. No. 1995-67 at 4.)

▪ With respect to the Supreme Court's rejection of Fourth Amendment habeas claims, the Court has refused to extend the doctrine of *Stone v. Powell* to other collateral constitutional challenges.[6] The logic of *Stone v. Powell*, therefore, appears to have little application to Sixth Amendment charging-document claims. Furthermore, the rationale offered by jurisdictions that refuse to address challenges to charging documents during state post-conviction proceedings appears at odds with the idea of a constitutional "right." All criminal defendants have a constitutional right to be informed of the charges against them. U.S. CONST. amend. VI; *Gov't of the V.I. v. Joseph*, 765 F.2d 394, 397 (3d Cir. 1985). Differences between the temporary confinement power of a charging document and the more enduring power of a judgment of conviction, at best, are artificial and academic distinctions that can result in the profound truncation of sixth amendment liberties. Although limitations on fourth-amendment claims may be justified because the exclusionary rule "is not a personal constitutional right," but instead serves to deter future constitutional violations, *Stone*, 428 U.S. at 486, 96 S. Ct. at 3048-49, the right of defendants to be informed of the charges against them is fundamental in nature, *cf. Withrow*, 507 U.S. 680, 691-92, 113 S. Ct. 1745, 1753 (reasoning that the fifth amendment *Miranda* privilege "reflects many of our fundamental values and most noble aspirations" (internal quotation marks omitted)). The right of notice serves as the theoretical premise upon which the Sixth Amendment is built. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of

---

[6] *See Brewer v. Williams*, 430 U.S. 387, 414, 97 S. Ct. 1232, 1247, 51 L. Ed. 2d 424 (1977) (Powell, J., concurring) (Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel), *subsequently upheld by Nix v. Williams*, 467 U.S. 431, 450 n.7, 104 S. Ct. 2501, 2512, 81 L. Ed. 2d 377 (1984); *Jackson v. Virginia*, 443 U.S. 307, 323-24, 99 S. Ct. 2781, 2791-92, 61 L. Ed. 2d 560 (1979) (insufficiency of evidence claims); *Rose v. Mitchell*, 443 U.S. 545, 560-61, 99 S. Ct. 2993, 3002, 61 L. Ed. 2d 739 (1979) (claims of discrimination in grand-jury selection); *Kimmelman v. Morrison*, 477 U.S. 365, 383-84, 106 S. Ct. 2574, 2587, 91 L. Ed. 2d 305 (1986) (Sixth Amendment ineffective-assistance-of-counsel claims); *Withrow v. Williams*, 507 U.S. 680, 683, 113 S. Ct. 1745, 1748, 123 L. Ed. 2d 407 (1993) (claims concerning *Miranda*-warning violations).

16

the accusation[.]"). Being fundamental in nature, it cannot be subordinated in favor of a cost-benefit analysis. *Cf. Rose*, 443 U.S. 545, 562-63, 99 S. Ct. 2993, 3003-04 (determining that cost-benefit reasoning cannot excuse constitutional defects in the state judiciary's grand jury selection procedure). Accordingly, this Court finds that challenges to a charging document—in this case, an information—are cognizable in proceedings for habeas corpus relief in the Territorial Court.

### b. Whether the Amendment of the Information Constituted Error[7]

■ Having determined that Simon may collaterally attack the sufficiency of the Amended Information, the next question that this Court must address is whether the decision to allow the government to amendment the Information was in error. Under the facts of this case, this Court believes that it was. Rule 7 of the Federal Rules of Criminal Procedure is explicit in its requirement that an information may be amended only "if no additional or different offense is charged." FED. R. CIV. P. 7(e). Such straightforward language leaves no room for alternative interpretations. Although the appellate court was correct in holding that the substitution of felony murder for premeditated murder did not amount to the charging of a different offense, (*see Simon*, D.C. Crim. App. No. 1995-67 at 4), the appellate court simply did not consider whether the addition of robbery to the charging document constituted an additional or different offense. It is clear that the original Information did not mention robbery. It is just as clear that both the Amended Information and Second Amended Information contain one count of robbery. Thus, the amendment of the Information to include robbery violated the unequivocal language of FED. R. CRIM. P. 7(e).

---

[7] As an initial matter, this Court rejects Simon's contention that the amendment of the Information—in and of itself—on the day of trial deprived defense counsel of the opportunity to prepare an adequate defense. The government first mentioned robbery during the January 10 pretrial conference, thereby giving defense counsel at least thirteen days' notice of the government's new theory. (*See* tr. of Jan. 10, 1995, at 19.) Other courts have found no violation of a defendant's sixth amendment right to notice in even narrower time frames. *See, e.g., Meek v. State*, 2002 WY 1, 37 P.3d 1279, 1284-85 (Wyo. 2002) (amendment on day of trial); *State v. Derango*, 2000 WI 89, 236 Wis. 2d 721, 613 N.W.2d 833, 847 (2000) (amendment at close of evidence); *Holbrook v. State*, 133 Md. App. 245, 754 A.2d 1103, 1110 (Ct. Spec. App. 2000) (amendment immediately before trial). Thus, purely with respect to the issue of notice, the government's amendment of the information on the day of trial was not improper.

17

Respondents' implication that such amendment was excusable because it is unclear how the amendment prejudiced Simon ignores the plain language of the rule. Rule 7(e) already provides for prejudice to the defendant. *See* FED. R. CIV. P. 7(e) (allowing an amendment to the information "if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced"). To read the rule to allow amendment except when it is prejudicial to do so both misreads the explicit language of the text and creates an illogical redundancy in its terms—in effect, "amendment is allowed unless it is prejudicial and it is prejudicial." To allow amendment where amendment is clearly prohibited would read the first clause of Rule 7(e) out of existence. *See United States v. Personal Finance Co.*, 13 F.R.D. 306, 311 (S.D.N.Y. 1952) ("If the amendment were here permitted ... there would have been no point to including 'if no additional or different offense is charged;' it would have been necessary to provide only that amendment would not be allowed 'if substantial rights of the defendant are not prejudiced.'"). Accordingly, the decision to allow the government to amend the Information was erroneous.

### c. Whether the Improper Amendment of an Information Constitutes Trial Error or Structural Error

Having found error, the next step in the analysis is to determine whether this error constitutes trial error, which would make it amenable to a harmless error analysis, or structural error, which would make it reversible error *per se*. The Supreme Court elaborated on the differences between trial error and structural error in *Arizona v. Fulminante*.[8] The Court defined trial error as "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine" its effect on the trial. 499 U.S. 279, 308, 111 S. Ct. 1246, 1263-64, 113 L. Ed. 2d 302 (citing cases). The Court defined structural error as "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309, 111 S. Ct. at 1265. Neither category of error addresses improper amendments to charging documents, and the majority of lower-court cases that address this error standard do so in the context of improper variances and

---

8 499 U.S. 279, 306-10, 111 S. Ct. 1246, 1263-65, 113 L. Ed. 2d 302 (1991).

constructive amendments to indictments. *See, e.g., McCoy v. United States*, 266 F.3d 1245 (11th Cir. 2001).

▌Although the right to be informed as to pending charges suggests structural error, this Court believes that notice is the linchpin of a sixth amendment inquiry.[9] Circumstances may well exist where the improper amendment of an information will undercut a defendant's actual notice of the pending charges. *Cf. Suniga v. Bunnell*, 998 F.2d 664, 667 (9th Cir. 1993) (*dicta*) (reasoning that structural error may occur "when the court allows the defense to be ambushed with [a jury] instruction that changes the theory of the case at the last minute"). However, given that Simon was not surprised unduly by the addition of robbery to the Information, it appears that this error does not implicate his right to notice, and therefore does not qualify as structural error. Therefore, habeas relief will be granted only if the government's amendment of the Information does not qualify as harmless error.

### d. Whether the Improper Amendment of the Information Constitutes Harmless Error

The Court is then faced with the question of the standard it must use in determining whether the error in this case was harmless. Again, this Court has no binding precedent to direct its analysis. Under federal habeas corpus law, the inquiry for harmless error asks "whether the error had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 1721-22, 123 L. Ed. 2d 353 (1993). The *Brecht* standard replaced the

---

[9] *See, e.g., Hamling v. United States*, 418 U.S. 87, 117-18, 94 S. Ct. 2887, 2907-08, 41 L. Ed. 2d 590 (1974); *United States v. Pernillo-Fuentes*, 252 F.3d 1030, 1032 (9th Cir. 2001); *United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001); *United States v. Stein*, 233 F.3d 6, 23 (1st Cir. 2000); *United States v. Lee*, 232 F.3d 653, 656 (8th Cir. 2000); *United States v. Gama-Bastidas*, 222 F.3d 779, 785 (10th Cir. 2000); *United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999); *United States v. Stansfield*, 171 F.3d 806, 812 (3d Cir. 1999); *Borchardt v. State*, 367 Md. 91, 786 A.2d 631, 652 n.6 (2001); *Winn v. State*, 748 N.E.2d 352, 356 (Ind. 2001); *State v. Woodard*, 146 N.H. 221, 769 A.2d 379, 386 (2001); *People v. Casey*, 95 N.Y.2d 354, 740 N.E.2d 233, 236, 717 N.Y.S.2d 88 (2000); *State v. Hammonds*, 30 S.W.3d 294, 299 (Tenn. 2000); *Riney v. State*, 28 S.W.3d 561, 565 (Tex. Crim. App. 2000); *Baumgartner v. State*, 7 P.3d 912, 916 (Wyo. 2000); *State v. Derango*, 2000 WI 89, 613 N.W.2d 833, 847, 236 Wis. 2d 721 (2000); *Williams v. United States*, 756 A.2d 380, 388 (D.C. 2000); *Locke v. State*, 341 S.C. 54, 533 S.E.2d 324, 325 (2000); *Commonwealth v. Dalton*, 259 Va. 249, 524 S.E.2d 860, 862 (2000); *State v. Smith*, 268 Kan. 222, 993 P.2d 1213, 1220 (1999).

longstanding *Chapman* standard, wherein a constitutionally-deficient conviction will be set aside unless the error is "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967). *Chapman* still controls both federal and state direct appeals, including direct appeals from the Territorial Court of the Virgin Islands. *See, e.g., Soldiew v. Gov't*, 1994 U.S. Dist. LEXIS 7039, 30 V.I. 112, 117 (D.V.I. App. Div. 1994) ("To find an error harmless, the appellate court must determine beyond a reasonable doubt that the error did not contribute to the verdict.") Although the *Brecht* standard is compulsory for federal habeas corpus courts, it has no binding effect on state or territorial habeas courts.

█ For several reasons, this Court believes that the *Chapman* standard is the appropriate standard for collateral review in the Territorial Court. In the first place, the Supreme Court crafted the *Brecht* standard in light of federalism and comity concerns that, although present in cases where federal courts review state-court convictions, are not present here. *See Brecht*, 507 U.S. at 635, 113 S. Ct. at 1721 ("Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." (quoting *Engle v. Isaac*, 456 U.S. 107, 128, 102 S. Ct. 1558, 1572, 71 L. Ed. 2d 783 (1982))). The Supreme Court also based its *Brecht* rule on the proposition that, "because the state courts can properly apply the *Chapman* harmless error standard on direct review, the federal courts need only review those decisions under the [*Brecht*] harmless error standard." *Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir. 1993). This reasoning, however, presupposes that an appeals court actually uncovers error in its deliberations. In this case, the appeallate court found no error in the government's amendment of the Information to reflect a new count of robbery despite a clear violation of FED. R. CRIM. P 7(e). Thus, a stringent definition of harmless error, such as that outlined in *Brecht*, potentially would allow a constitutional trial error pass through the collateral review process because the error did not "substantially" influence the jury's verdict. Although this Court is aware that habeas corpus is not meant as a substitute for direct appeal, *Teague v. Lane*, 489 U.S. 288, 306, 109 S. Ct. 1060, 1073, 103 L. Ed. 2d 334 (1989), it is equally committed to upholding the promise of The Great Writ, which protects petitioners from imprisonment in violation of the United States Constitution. *See* 5 V.I.C. § 1301; *INS v. St. Cyr*, 533 U.S. 289, 301-03,

121 S. Ct. 2271, 2280, 150 L. Ed. 2d 347 (2001) (recognizing that the traditional purpose of the writ of habeas corpus has been to protect citizens from unlawful detention by the government). This Court, therefore, will adopt the *Chapman* harmless error standard in its review of Simon's claims.

Unfortunately for Simon, even under the more lenient *Chapman* standard of review, the government's repeated amendment of the charging document, although clearly at odds with the language of FED. R. CRIM. P. 7(e), appears to constitute nothing more than harmless error. As discussed above, the linchpin of sixth amendment guarantees is notice.[10] Here, it is clear that Simon had adequate notice—almost two weeks—that the government intended to amend the Information to include a robbery charge. (*See* tr. of Jan. 10, 1995, at 19.)

Furthermore, the factual posture of the case militates in favor of harmless error. In this case, there was significant overlap between the robbery offense and the other charged offenses. The facts that gave rise to the robbery offense took place within the same narrow time frame and location—namely, between Simon's entry into Ezekial's house and his exit—as the burglary offense. Thus, as a practical matter, there are precious few evidentiary matters or defenses that would have been undermined by the government's amendment. Indeed, as the appellate court noted, defense counsel never requested a continuance to explore any alternate theories of the case and, even if it did, it is difficult to imagine how defense counsel would have proceeded differently.[11]

Additionally, with respect to Simon's complaint that defense counsel had no time to prepare for the additional robbery offense, the transcript belies this notion. Simon had adequate time to review Roach's prior testimony for any impeaching statements.[12] It is abundantly clear

---

[10] *See supra* note 7 and accompanying text.

[11] This Court previously discounted this argument when Respondents raised it to excuse the government's failure to comply with FED. R. CRIM. P. 7(e). (*See* Resp't's Opp'n Resp. to Pet'r's Am. Writ of Habeas Corpus at 3.) This Court continues to regard this stance as indefensible because it fails to recognize that the addition of robbery to the Amended Information undeniably constituted a different offense. However, Respondents' argument assumes a different pallor when presented in the context of a harmless-error analysis in a habeas corpus action.

[12] It is worth noting that, to date, Simon has never singled out any additional statements that were made by Roach in the district court that would have further impeached his testimony at Simon's trial.

that defense counsel was able to cross-examination Roach vigorously and elicit evidence that Roach was a liar and that he had agreed to testify in exchange for protection. (Tr. vol. I at 93, 118, 123-24, 140.) Thus, it is apparent that the government's error in amending the Information to include robbery as a predicate for felony murder, although improper as a matter of law, was harmless beyond a reasonable doubt.

## 2. Judicial Estoppel and Jury Instructions

Citing the civil-law principle that a party may not contradict a previously-held position in a subsequent proceeding involving the same parties, Simon argues that the government should have been estopped from allowing Roach to testify that Simon struggled with Connor when it also relied on Connor's testimony that Roach was the assailant. (Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus at 7-8.) Respondents answer that, because Virgin Islands law treats an aider and abettor the same as it treats a principal offender, it does not matter whether the government altered its theory as to who was the actual triggerman. (Resp't's Opp'n Resp. to Pet'r's Am. Writ of Habeas Corpus at 4.) Respondents contend that, to the extent that any of Roach's testimony was inconsistent, the defense had ample opportunity to explore the matter on cross-examination, and the trial judge instructed the jury accordingly. (*Id.* at 5-6.)

In his *pro se* reply, Simon asserts for the first time that the trial judge failed to properly instruct the jury on the elements of aiding and abetting. (Pet'r's Reply at 12.) Simon also reiterates that, because Roach was convicted on the theory that he shot Ezekial and brandished a weapon in the robbing of Connor, the government was precluded on estoppel principles from presenting evidence that Simon shot the victim and aided and abetted Roach in the robbery of Connor. (*Id.* at 13.) Simon contends that Roach should not have been allowed to assert his own innocence at his trial, and then, upon conviction, testify that Simon aided and abetted the murder of Ezekial and the robbery of Connor in order to receive a reduction in sentence. (*Id.* at 14-15.)

The Virgin Islands Code provides in pertinent part that:

> (a) Whoever commits a crime or offense or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

22

(b) Whoever willfully causes an act to be done which if directly performed by him or another person would be a crime or offense, is punishable as a principal.

(c) Persons within this section shall be prosecuted and tried as principals, and no fact need be alleged in the information against them other than is required in the information against the principal.

14 V.I.C. § 11. In order to secure a conviction for aiding and abetting the commission of a crime, the government must prove that (1) the defendant associated himself with a criminal venture, (2) he participated in it as something he wished to bring about, and (3) he sought by his words or action to make it succeed. *United States v. Xavier*, 29 V.I. 279, 288, 2 F.3d 1281, 1288 (3d Cir. 1993) (interpreting 14 V.I.C. § 11). "The government can show the requisite intent with evidence defendant encouraged or helped the perpetrator." *Id.*

█ With respect to the issue of collateral estoppel, or issue preclusion, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Dowling v. United States*, 493 U.S. 342, 347, 110 S. Ct. 668, 672, 107 L. Ed. 2d 708 (1990). *See also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Collateral estoppel "bars [the] relitigation of questions distinctly put in issue and directly determined adversely to the party against which the estoppel is asserted." *Carteret Sav. Bank v. Pelican Beach Props., Ltd.*, 1992 U.S. Dist. LEXIS 12734, 27 V.I. 285, 290 (D.V.I. 1992) (internal citations omitted). In a criminal context, evidence of a prior acquittal or conviction can foreclose the government from reasserting certain issues against the same defendant in a subsequent trial. *United States v. Blyden*, 740 F. Supp. 376, 380-81 (D.V.I. 1990) (quoting *Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970)).

## a. Whether Simon's Claims Are Procedurally Barred

Before discussing the substance of Simon's arguments, two matters must be addressed. The first is the failure of Simon to raise on direct

appeal both his collateral estoppel claim and his challenge to the trial court's jury instructions. In many state habeas corpus courts, it is a common practice that, where prisoners could have raised their claims on direct appeal and failed to do so, they effectively waive their opportunity to have these claims collaterally reviewed.[13] However, to the extent that this procedural-default rule may hold sway under either Virgin Islands case law or statute, the failure of a state prisoner to comply with a state procedural rule is an affirmative defense that must be raised by the respondent. *See Trest v. Cain*, 522 U.S. 87, 89, 118 S. Ct. 478, 480, 139 L. Ed. 2d 444 (1997) (holding that a court sitting in habeas corpus is not required to raise *sua sponte* a state's procedural default defense). In this case, Respondents chose to defend against Simon's collateral estoppel claim. Thus, this Court will not exercise its discretion to invoke an affirmative defense on behalf of Respondents that they themselves did not raise.

### b. Whether Simon May Raise New Issues for the First Time in a Reply Pleading

The second is Simon's assertion, for the first time in a reply brief, that the trial judge erred in its jury instruction concerning the elements of aiding and abetting. Generally, courts usually will not consider arguments that were raised by the petitioner for the first time in a reply pleading. *See, e.g., United States v. Boggi*, 74 F.3d 470, 478 (3d Cir. 1996) (reasoning that parties should not be prejudiced by the lack of an opportunity to respond to new issues raised by an opponent). Simon's challenge to the trial court's jury instruction was not raised before, and therefore, this Court would be within its authority to discount Simon's arguments on this point. Nevertheless, out of an abundance of caution for the rights of the petitioner, this Court will exercise its discretion and address this issue as well.

---

[13] *See, e.g., St. Claire v. State*, 2002 ND 10, 638 N.W.2d 39, 43 (N.D. 2002); *State v. Curtright*, 262 Neb. 975, 637 N.W.2d 599, 605 (2002); *People v. Hudson*, 195 Ill. 2d 117, 745 N.E.2d 1246, 1250, 253 Ill. Dec. 712 (2001); *Smith v. State*, 2000 MT 327, 303 Mont. 47, 15 P.3d 395, 398 (2000); *Maharaj v. State*, 778 So. 2d 944, 959 (Fla. 2000); *Ben-Yisrayl v. State*, 738 N.E.2d 253, 258 (Ind. 2000); *Baze v. Commonwealth*, 23 S.W.3d 619, 626 (Ky. 2000); *State v. Baker*, 272 Mont. 273, 901 P.2d 54, 58 (1995); *Collins v. State*, 477 N.W.2d 374, 376 (Iowa 1991).

### c. Collateral Estoppel

█ Simon's collateral estoppel claim must ultimately fail because Simon cannot demonstrate an identity of parties between Roach's conviction for the murder of Ezekial and the robbery of Connor and his own prosecution the same offenses. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmt. a ("The rule of issue preclusion is operative *where the second action is between the same persons who were parties to the prior action*, and who were adversaries ... with respect to the particular issue[.]") (emphasis added). Simon was not a party to Roach's trial; thus, the determination of any issue of ultimate fact made in Roach's trial has no application to the subsequent prosecution of Simon.

### d. Jury Instructions

█ Furthermore, despite Simon's protestations to the contrary, this Court has no difficulty in finding that the trial court properly instructed the jury on the elements of aiding and abetting. The trial court quoted the relevant language of 14 V.I.C. § 11. (*See* tr. vol. II at 151.) The trial court also stated that it was necessary for the jury to find that Simon "willfully associated himself in some way with a criminal venture, and willfully participated in it as he would in something he wishes to bring about[.]" (*See id.*) The trial court also instructed the jury that aiding and abetting requires a finding that the defendant "willfully [sought] by some act or omission of his, to make the criminal venture a success." (*See id.*) The trial judge even cautioned the jury that "mere presence at the scene of a crime, and knowledge that a crime is being committed, is not sufficient to establish that the Defendant aided and abetted in the crime[.]" (*See id.* at 152.) Given that the trial court's instruction paralleled the language of the leading case on point, *see Xavier*, 29 V.I. at 288, 2 F.3d at 1288, there is no indication that the trial court's jury instructions were flawed. This Court, therefore, will deny habeas corpus relief on this claim as well.

### 3. Prosecutorial Misconduct[14]

Simon charges that the government violated the tenets of (1) *Napue v. Illinois*[15] by knowingly introducing Roach's perjured statements that he

---

[14] Simon failed to present this issue to the appellate court on direct review. *See supra* § 2(a). Nonetheless, given Respondents' failure to raise this affirmative defense, the Court will dispose of this matter accordingly.

was only to receive "protection" in exchange for his testimony, and (2) *Brady v. Maryland*[16] by failing to turn over evidence that, in fact, Roach was to receive a reduction in sentence for his testimony at Simon's trial. (Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus at 8-13.) Simon argues that, even though the United States Attorneys' Office handled Roach's prosecution, the Government of the Virgin Islands had an obligation to produce the terms of any agreement between the Roach and his prosecutors. (*Id.* at 13-14.) Simon also asserts that the government's closing remarks to the jury improperly bolstered Roach's credibility and were particularly prejudicial to him because Roach contradicted Connor's testimony that Roach, not Simon, struggled with him over the gun. (*Id.* at 14-17.)

Respondents answer that Simon's allegation of an agreement between the Virgin Islands Attorney General's Office and Roach is merely speculative. (Resp't's Opp'n Resp. to Pet'r's Am. Writ of Habeas Corpus at 7-8.) Respondents contend that, even if the government did fail to turn over evidence of such an arrangement, Simon cannot sustain his *Brady* claim because he cannot demonstrate that the evidence would have affected the outcome of his trial. (*Id.* at 8-10.) With respect to the government's closing argument, Respondents suggest that, given the overwhelming evidence of Simon's guilt, those comments did not undermine the basic fairness of the trial. (*Id.* at 10-11.) Simon's *pro se* reply is limited to a request for an evidentiary hearing to produce evidence of the government's misconduct. (Pet'r's Reply at 16.)

 The United States Supreme Court has held that a denial of fourteenth amendment due process occurs when a state government either knowingly secures a conviction through the use of perjured testimony, or allows the admission of perjured testimony to go uncorrected if it occurs. *Napue v. Illinois*, 360 U.S. at 269, 79 S. Ct. at 1177. It is immaterial that the perjured testimony only implicates issues of the witness' credibility. 360 U.S. at 269-70, 79 S. Ct. at 1177. However, the presentation of such evidence constitutes reversible error only if there was a reasonable probability that the perjured testimony affected the outcome of the trial. *United States v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976); *United States v.*

---

[15] 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959).
[16] 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

26

*Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985). The Supreme Court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383.

Using similar language, the Supreme Court summarized the government's obligation to turn over exculpatory *Brady* material as follows:

> It is well settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. Although courts have used different terminologies to define "materiality," a majority of this Court has agreed, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Pennsylvania v. Ritchie*, 480 U.S. 39, 57, 107 S. Ct. 989, 1001, 94 L. Ed. 2d 40 (1987) (citations omitted) (editing in original). Finally, with respect to whether the statements of a prosecutor violated a defendant's due process rights, a court must examine whether the challenged statements, taken in the context of the trial as a whole, were sufficiently prejudicial so as to deprive the defendant of a fair trial. *Werts v. Vaughn*, 228 F.3d 178, 197-98 (3d Cir. 2000) (citing *Greer v. Miller*, 483 U.S. 756, 765, 107 S. Ct. 3102, 3109, 97 L. Ed. 2d 618 (1987)); *Plaskett v. Government of the V.I.*, 147 F. Supp. 2d 367, 376 (D.V.I. App. Div. 2001).

This Court does not believe that Simon's claims of prosecutorial misconduct warrant habeas corpus relief. Regarding Simon's assertion that the government failed to correct Roach's allegedly perjured statement that he was promised only protection, Simon fails to present a single affidavit, letter, or document to support his contention that either the United States Attorneys' Office or the Virgin Islands' Attorney General's Office offered Roach a reduction in sentence in exchange for his testimony. Simon's request for an evidentiary hearing into this matter was similarly devoid of any evidentiary proffers that would lend credence to his claim. (*See* Pet'r's Reply at 16.) Furthermore, the fact that the United States cited Roach's cooperation in the Territory's

27

prosecution of Simon as a factor in its request for a reduction in sentence does not, in and of itself, establish the existence of a *quid pro quo* between the United States or the Government of the Virgin Islands and James Roach.

Even assuming, *arguendo*, that Simon could demonstrate that the government violated its obligations under *Napue, Brady*, and *Bagley*, Simon has failed to establish that, but for the government's failure to (1) reveal any alleged agreement with Roach, or (2) correct Roach's allegedly perjured testimony, the outcome of his trial would have been different. The best that Simon can do is to argue that Roach was the only witness to place him at Connor's house. (Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus at 15). The testimony of other witnesses, however, corroborates both Simon's presence on St. John on the night of the offenses and the suspicious behavior of Simon as he attempted to elude detection. (*See* tr. vol. II at 6-20 (testimony of Joseph Allen) & 50-53 (testimony of Officer Donovan).) Additionally, although Roach and Connor disagreed as to who struggled with whom, they both agreed that a second masked individual was present at the scene and participated in the offense. (*See* tr. vol. I at 73, 75 (testimony of Roach) & 191-92, 197-98, 221, 232-33 (testimony of Connor).) Connor said that the shorter of the two men wore a mask, (*see id.* at 192), and the government demonstrated that Simon is shorter than Roach, (*see* tr. vol. II at 129). Although each of these facts, in isolation, may not have carried the day for the government, their cumulative effect was enough to reinforce Roach's version of events. Thus, it is clear that, even if the government or Roach had admitted to the existence of an alleged agreement, the corroborating testimony of other witnesses would have engendered confidence in the jury's verdict. Accordingly, there is no reasonable probability that, but for the use of allegedly perjured testimony and the government's alleged *Brady* violation, the outcome of the trial would have been different.

 Regarding Simon's claim of improper vouching for Roach's credibility, Simon again faces the shibboleth of prejudice. Upon examination of the trial testimony and closing arguments as a whole, it is apparent that the government's statements were not unduly prejudicial. In the first place, the government did not "bolster" Roach's statements as much as it rationalized why Roach gave testimony in his own trial that was at odds with his testimony in Simon's trial. (*See* tr. vol. II at 102).

The government did not say that Roach was honest, only that he should be believed. (*See id.*) This hardly constitutes improper vouching for a witness. Moreover, even assuming, *arguendo*, that the government's testimonials regarding Roach's credibility were inappropriate, defense counsel continuously and vigorously portrayed Roach as a self-serving liar, (*see* tr. vol. I at 93, 118, 123-24, 140), thereby obviating any prejudice to the defendant. Additionally, the trial court instructed the jury at length with respect to credibility determinations and the effect of Roach's prior felony conviction on his credibility. (See tr. vol. II at 138-41, 144-45.) Consequently, Simon's challenges to the government's behavior at trial are rejected.

### 4. Failure to Prove the Elements of Robbery[17]

Simon contends that, because the evidence showed only that Connor's bag of money was taken from his front porch and not from his immediate presence, the government failed to prove an essential element of robbery. (Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus at 17-19.) Simon further argues that, because the government failed to support the robbery count, his conviction for felony murder, which relied upon robbery as its predicate, is also flawed. (*Id.* at 19-21.) Respondents answer that Simon's reading of the phrase "from his person or immediate presence" is too narrow and at odds with contemporary legal thinking. (Resp't's Resp. Opp'n to Pet'r's Am. Writ of Habeas Corpus at 12-14.) Respondents argue that the use of a firearm during the robbery caused Connor to flee the scene, thereby allowing Simon to take the bag from the porch. (*Id.* at 14-15.) In his *pro se* reply pleading, Simon attempts to link the Virgin Islands robbery statute to California case law for the proposition that, because Connor could not "perceive" with his senses the taking of the bag of money, the bag was neither constructively nor actually taken from his immediate presence. (Pet'r's Reply at 16-20.)

This Court has not located any authoritative precedent that defines that phrase "person or immediate presence" as it applies to the Virgin Islands' robbery statute. Even so, it is abundantly clear that Simon's position is without merit. The trial testimony is clear that, upon

---

[17] Simon failed to present this issue to the appellate court on direct review. *See supra* § 2(a). Nonetheless, given Respondents' failure to raise this affirmative defense, the Court will dispose of this matter accordingly.

arriving at his house, Connor placed two bags of money on the porch of his house. (Tr. vol. I at 183-86.) After encountering the intruders inside the house and struggling with Roach outside the house, (*id.* at 189, 192, 194), Connor retrieved one of the bags of money and fled, (*id.* at 195-196). To suggest that the remaining bag of money was not taken from Connor's presence—immediate or otherwise—because Connor fled the scene in fear for his life, (*id.* at 196), strains common sense. It is beyond dispute that Connor was relieved of his property due to the violent actions of Simon and Roach. Certainly, a reasonable reading of "person or immediate presence" can encompass circumstances such as these.[18] Thus, the government proved every element of the robbery offense, and Simon's convictions for robbery and felony murder remain valid.

## CONCLUSION

Simon's claim that the government improperly amended the original Information (and, apparently, the Amended Information as well) is well-founded, but, even under a liberal construction of "harmless error," there remains little doubt that such an amendment did not prejudice Simon's rights. In so concluding, this Court holds that (1) challenges to a charging document are cognizable in Territorial post-conviction proceedings, (2) errors in the amendment of the charging instrument are properly classified as trial errors, and (3) the *Chapman* standard, which requires that error be harmless beyond a reasonable doubt, is the appropriate benchmark for analyzing trial errors. Additionally, this Court concludes

---

[18] *See, e.g., People v. Armstrong*, 183 Ill. 2d 130, 700 N.E.2d 960, 967, 233 Ill. Dec. 252 (1998) ("The property taken does not have to be within the victim's immediate control as long as there is some concurrence between defendant's threat of force and the taking of the victim's property."); *State v. Mitsuda*, 86 Haw. 37, 947 P.2d 349, 356 (1997) (recognizing that a person is "present" for the purposes robbery, if the thing taken is within the victim's observation or control, and that the victim would have retained control over the property, but for being overcome by violence or prevented by fear); *Jones v. State*, 652 So. 2d 346, 350 (Fla. 1995) (determining that, where the victim was attacked in bathroom, she did not surrender control of her purse that remained in her office); *People v. Harris*, 9 Cal. 4th 407, 886 P.2d 1193, 1202, 37 Cal. Rptr. 2d 200 (1994) (concluding that, where the victim was bound and blindfolded in the trunk of a car in a parking lot of an office complex that was around the corner from his home, the taking of property from victim's home and office was within the victim's presence); *State v. Hays*, 256 Kan. 48, 883 P.2d 1093, 1104 (1994) (recognizing that a "taking" is from the presence of the victim even where the victim's actual possession of the property is disrupted by force or threat of physical harm).

that Simon could not collaterally estop Roach from testifying at his trial because Simon was not a party to Roach's prosecution, and thus, could not argue that his role in the robbery of Connor and murder of Ezekial had been resolved previously. Also, Simon's complaint that the trial court gave incorrect jury instructions is unfounded in light of the trial court's adherence to precedential authority regarding the elements of aiding and abetting. Furthermore, Simon's assertion of *Brady* violations and prosecutorial misconduct are also baseless. Finally, a host of persuasive authority suggests that, when a defendant takes the property of another after forcing the victim to flee for fear of death or bodily injury, such property is removed from the "person or immediate presence" of the victim. Accordingly, this Court will decline Simon's petition for habeas corpus relief.[19]

---

[19] In the final pages of his amended petition, Simon obliquely raises the issue of ineffective assistance of trial counsel. Simon argues that any deficient performance on the part of trial counsel was excusable because it was attributable to alleged prosecutorial misconduct and the trial court's erroneous application of FED. R. CRIM. P. 7(e). (Pet'r's Mem. of Law in Supp. of Pet'r's Am. Writ of Habeas Corpus at 22.) Because Simon does not put the issue of counsel's performance directly before this Court, there is no need to address this claim on the merits.