**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200465-U

Order filed June 1, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0465 Circuit No. 02-CF-1519 |
| | ) | |
| MAURICE S. JOHNSON, | ) ) | Honorable Daniel Rippy, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hettel and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The circuit court did not err in denying the motion for leave to file a successive postconviction petition.

¶ 2     Defendant, Maurice S. Johnson, appeals the Will County circuit court's denial of his motion for leave to file a successive postconviction petition, arguing that he sufficiently alleged cause and prejudice. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged with the first degree murder of Darryl Chandler (720 ILCS 5/9-1(a)(1), (a)(2) (West 2002)). At a jury trial, the State's evidence established that Chandler was shot twice on January 12, 2002, while sitting in the driver's seat of a car in an alley off Herkimer Street. A silver handgun with a wooden handle was found on the seat next to Chandler's body and was determined to be the source of a spent cartridge casing discovered in the backseat.

¶ 5        Nicole Fielder testified that on January 11, 2002, she was at defendant's apartment. During that evening, defendant showed Fielder a silver handgun with a wooden grip. Defendant later left the apartment and did not return until midnight. Defendant told Fielder he had lost his gun and planned to retrieve it the next day. Fielder testified that during the late morning of January 12, 2002, defendant called her from his cousin's, Demarcus Johnson's phone. The State introduced testimony from a T-Mobile employee that established multiple calls were made between Fielder and Demarcus's numbers, the last of which occurred at 9:16 a.m. on the date of the murder. Fielder stated that during these calls, defendant asked her to help him rent a car. Later that day, between 11 a.m. and 2 p.m., Fielder and defendant ran various errands before Fielder dropped defendant off at his home. When she returned later, defendant was doing laundry. Fielder also testified that before the date of the incident, she had heard defendant and Chandler speaking on the phone "a couple times," and that defendant knew Chandler's phone number.

¶ 6        Bobbie Johnson testified that she was Demarcus's mother and defendant's aunt. On January 12, 2002, defendant was at her house with Demarcus. Both Demarcus and defendant used Bobbie's phone during this time. The State introduced evidence from a Sprint employee to establish calls were made between Bobbie's number and Chandler's number. The last call occurred at 9:24 a.m. on January 12, 2002.

¶ 7	Serena Fort testified that on the day of the murder, Chandler called her at approximately 10 a.m. before coming to her house. Chandler stayed at Fort's house for approximately 15 or 20 minutes before leaving in a car with a black male in the passenger seat.

¶ 8	Gregory Thompson testified that on the morning of the shooting, he noticed Chandler's car parked outside Fort's house. Thompson approached Chandler's vehicle to talk. Defendant was sitting in the passenger seat staring straight ahead and wearing a black jacket. On direct examination, Thompson stated he and defendant were in-laws but that he had never seen defendant before. Later on cross-examination he stated "I seen [sic] him before, but not like in a month or a week or a year. I seen [sic] him in my life, but the next time I seen him was that day. I seen [sic] him once or twice in my life."

¶ 9	Carleton Williams testified that on January 12, 2002, at approximately 10 a.m. or 10:30 a.m., he exited his apartment and saw defendant walking. Defendant informed Williams that he had "hit a lick." Williams testified that defendant informed him that he had shot Chandler and stolen 2.5 ounces of cocaine.

¶ 10	Willie Thigpen testified that he lived in the same building as Williams. Thigpen had met defendant a few times before the date of the incident. On the subject date, defendant offered Thigpen $5 to give him a ride. At first, defendant wanted to be driven to Herkimer Street but then asked to be dropped off at his home.

¶ 11	Detective Brian Lewis testified that in the late afternoon of January 12, 2002, he searched defendant's apartment with permission from defendant's mother. On defendant's bed, Lewis found a jacket that was wet and smelled of laundry detergent. An evidence technician testified that he recovered fingernail clippings, clothing, and blood samples from Chandler. While collecting this evidence, detectives gave the technician two garbage bags full of defendant's wet clothes,

3

including a black jacket. The technician did not remember if he changed into fresh gloves after taking a blood sample from Chandler but before taking possession of defendant's clothing.

¶ 12    Katherine Davis, a forensic biologist, testified that she found a spot of blood on the sleeve of the black jacket. She did not know how the blood came to be on the jacket. She stated it was possible the blood could have been transferred from a latex glove. She developed a DNA profile from the bloodstain, which matched Chandler's profile. She found another bloodstain of the same size and shape on one of defendant's shirts. The profile from this stain matched defendant's profile. Davis testified the profile she developed from the jacket "would be expected to occur in approximately 1 in 47 quadrillion black, 1 in 6.37 quintillion Hispanic and 1 in 3.1 quintillion white unrelated individuals." Davis stated she "concluded that the blood that was indicated in the stain from the jacket was consistent with having originated from *** Chandler." The State then asked, "And that's the mathematical ratio that you gave?" Davis responded, "That the probability or the frequency of occurrence was the statistics that I gave, yes."

¶ 13    During closing arguments, the State argued that the phone records established defendant's "opportunity" to commit the murder. In rebuttal, the State argued that the only logical conclusion was that defendant called Chandler within 10 minutes from when he called Fielder. The jury found defendant guilty of first degree murder, and the court sentenced him to 55 years' imprisonment plus a 25-year firearm sentencing enhancement.

¶ 14    On direct appeal, defendant's appellate counsel only raised a single issue regarding the propriety of defendant wearing a security belt at his jury trial. We affirmed the circuit court's decision. *People v. Johnson*, No. 3-04-0894 (2006) (unpublished order under Illinois Supreme Court Rule 23). On February 26, 2007, defendant filed a *pro se* postconviction petition alleging his appellate counsel was ineffective for failing to raise several issues on direct appeal. The circuit

4

court summarily dismissed the petition, and we affirmed. *People v. Johnson*, No. 3-07-0303 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 15    Defendant then filed multiple motions for leave to file a successive postconviction petition. On December 3, 2009, defendant sought leave to file a successive postconviction petition alleging a *Zehr* violation. The circuit court denied the motion for leave to file, and we affirmed, finding the issue was forfeited and did not constitute plain error. *People v. Johnson*, No. 3-10-0093 (2011) (unpublished summary order under Illinois Supreme Court Rule 23 (c)). On December 21, 2016, defendant filed another motion for leave to file a successive postconviction petition with supporting documentation, alleging the State violated his right to due process by failing to disclose Williams's entire criminal history including the fact that he had several criminal matters pending against him at the time of defendant's trial. The circuit court denied the motion for leave and we affirmed, holding any error did not so infect the trial that defendant's conviction violated due process because there was already "considerable evidence [presented] at trial challenging Williams's credibility." *People v. Johnson*, 2019 IL App (3d) 170027-U, ¶ 28.

¶ 16    Defendant filed another motion for leave to file a successive postconviction petition on February 27, 2020, which is the subject of this appeal. Defendant claimed that Demarcus called Chandler the morning of January 12, 2002, to discuss events that occurred at a basketball game they both attended the night before. Defendant attached an affidavit from Demarcus attesting this. The affidavit further asserted that defendant was wearing a blue and white New York Yankees jacket the morning of the murder, and the police told Demarcus he would be charged if he did not say defendant called Chandler on the morning of the murder and that he was wearing a black jacket that day.

5

¶ 17    Defendant claimed that the delay in providing the information in Demarcus's affidavit was due to the fact that Demarcus had been incarcerated, on probation, and on parole. Defendant further claimed that Demarcus was not available to testify at the trial because his whereabouts were unknown as he had a warrant out for his arrest and was evading authorities. The court denied the motion for leave to file the successive postconviction petition, finding that "defendant's argument in the light most favorable is not sufficient or likely to overturn the results of this matter." Defendant appealed.

¶ 18                                    II. ANALYSIS

¶ 19    On appeal, defendant argues the circuit court erred in dismissing his motion for leave to file a successive postconviction petition because he sufficiently alleged cause and prejudice. The denial of leave to file a successive postconviction petition is reviewed *de novo*. *People v. Edwards*, 2012 IL App (1st) 091651, ¶ 25.

¶ 20    The Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a process for a criminal defendant to assert that his conviction resulted from a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both. *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Claims not brought in the initial postconviction petition are statutorily waived. 725 ILCS 5/122-3 (West 2020); *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002). "Only when fundamental fairness so requires will the strict application of this statutory bar be relaxed." *Pitsonbarger*, 205 Ill. 2d at 458. Fundamental fairness in this context is defined in terms of the cause and prejudice test, so a petitioner may file a successive postconviction petition if they meet this test. *Id.* at 459. "[T]he cause-and-prejudice test for a successive petition involves a higher standard than the first-stage frivolous or patently without merit standard." *People v. Smith*, 2014 IL 115946, ¶ 35. Motions for leave to file successive postconviction petitions should be denied

6

where it is clear from the petition and supporting documentation that it fails as a matter of law or is insufficient to justify further proceedings. *Id.*

¶ 21 A petitioner shows cause by identifying an objective factor that impeded their ability to raise a specific claim during the initial postconviction proceedings and demonstrates prejudice by showing that the error so infected their case that the resulting conviction or sentence violated due process. *Pitsonbarger*, Ill. 2d at 460. To establish prejudice, the petitioner must not only demonstrate " 'errors at *** trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error or constitutional dimensions.' " *People v. Hudson*, 195 Ill. 2d 117, 123-24 (2001) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

¶ 22 Here, defendant has failed to establish cause and prejudice. Taking the allegations in the motion and affidavit as true, defendant fails to point to an objective factor that prevented his ability to obtain this evidence earlier. Even if defendant was not aware Demarcus placed a call on the morning of the incident, he knew Demarcus was present at the house and that the phone call that was placed to Chandler was included in the State's case against him. See, e.g., *People v. Lenoir*, 2021 IL App (1st) 180269, ¶ 43. Further, if we accept as true that Demarcus was unavailable to testify, and defendant was unable to obtain the affidavit for the initial postconviction petition, there is nothing that explains the 20-year delay in presenting this evidence. Defendant has therefore not met his burden in showing cause.

¶ 23 Moreover, defendant has failed to establish prejudice. Accepting as true that it was Demarcus who called Chandler the morning of January 12, 2002, Demarcus's unavailability to testify and the prosecutor's allegedly incorrect statements regarding the phone call do not rise to the level of "infecting his entire trial with error." See *Hudson*, 195 Ill. 2d at 123-24. This phone

call has no relation to the other incriminating evidence such as (1) Fielder's testimony that defendant showed her the murder weapon the day before the incident, (2) the testimony of Williams that defendant confessed to the murder, (3) Thigpen's testimony that defendant paid him for a ride shortly after the murder from the area of the murder, and (4) the DNA evidence from the State's forensic analysis. We, therefore, agree with the circuit court that the newly obtained affidavit from Demarcus is not sufficient or likely to overturn the jury's verdict.

¶ 24    In coming to this conclusion, we reject defendant's attempt to cast doubt on the jury's verdict by arguing Williams was not a credible witness and there were significant deficiencies in the DNA evidence. The jury was presented considerable evidence attacking Williams's credibility, and it was up to the jury to make a credibility determination. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 56. Demarcus's testimony would have no bearing on this determination. The jury was also presented with the DNA evidence and believed there was sufficient evidence to find defendant guilty beyond a reasonable doubt.

¶ 25                          III. CONCLUSION

¶ 26    The judgment of the circuit court of Will County is affirmed.

¶ 27    Affirmed.